UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
     :
UNITED STATES OF AMERICA    :
     :    16-CR-563 (JPO)
-v-    :
     :    OPINION AND ORDER
JOHN PAULING,    :
     :
               Defendant.    :
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      On February 16, 2017, following a jury trial, John Pauling was convicted of conspiring to traffic in heroin, as well as several other narcotics and firearms crimes. (Dkt. No. 37.) Pauling moves pursuant to Federal Rule of Criminal Procedure 29 to vacate the portion of the jury's verdict which found that the charged conspiracy involved a least 100 grams of heroin. In the alternative, Pauling moves for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons that follow, Pauling's motion to vacate is granted, and his motion for a new trial is conditionally granted.

**I.    Background**

      On January 19, 2017, a grand jury returned a superseding indictment (S1) charging Pauling on eight counts. (Dkt. No. 25.) Count One charged Pauling with conspiring to distribute and possess with intent to distribute at least 100 grams of mixtures and substances containing heroin.[1] Counts Two, Three, and Four charged Pauling with distributing and possessing with intent to distribute heroin. Count Five charged Pauling with unlicensed dealing in firearms. Count Six charged Pauling with using and carrying a firearm during and in relation to—or

---

[1] Except where otherwise noted, this opinion uses the term "heroin" to refer broadly to any mixture or substance containing a detectable amount of heroin.

1

possessing a firearm in furtherance of—the conspiracy charged in Count One. Counts Seven and Eight charged Pauling with possessing a firearm after a previous felony conviction.

Pauling's trial began on February 13, 2017, and concluded on February 16, 2017. Through his counsel's arguments to the jury, Pauling admitted to each of the crimes charged in the superseding indictment except for Counts One and Six, which he contested. (*See* Tr. 33:11-35:8, 507:11-508:2, Dkt Nos. 38-45.) As the defense conceded it would, the evidence at trial showed that Pauling engaged in a series of narcotics and firearm transactions over the course of several months in 2016.

The Government's witnesses comprised an undercover officer who purchased heroin and two firearms from Pauling (*id.* at 41:10-183:21); an eyewitness who testified that she was present on February 18, 2016, during what she assumed to be a narcotics sale conducted by Pauling (*id.* at 184:3-205:19); a detective with the New York City Police Department, who was also present on February 18 and recovered a discarded bag of heroin at the scene (*id.* at 205:25-216:14); a special agent with the Drug Enforcement Administration ("DEA"), who observed Pauling's interactions with a man named Kevin Lowe on June 26, 2016, and who participated in Pauling's arrest and the recovery of drug paraphernalia from his apartment on July 14, 2016 (*id.* at 236:15-277:22); and a DEA case agent who presented the recordings of a judicially authorized wiretap of Pauling's cell phone (*id.* at 279:23-379:7). The defense did not call any witnesses.

The parties also submitted into evidence calls and text messages obtained under the wiretap (Gov't Exs. 701-89; Def. Exs. A-B; *see also* Gov't Ex. 304); recordings of the undercover officer's interactions with Pauling (Gov't Exs. 501-10; *see also* Gov't Ex. 307); two firearms, ammunition, and 26.4 grams of heroin, which the undercover officer purchased from Pauling (Gov't Exs. 202-04, 207-08, 217, 219-22; *see also* Gov't Exs. 301 ¶¶ 2-4; Gov't Ex.

2

303); 14.8 grams of heroin recovered from the scene of the February 18 surveillance (Gov't Ex. 201; *see also* Gov't Ex. 301 ¶ 1); and the drug paraphernalia seized from Pauling's apartment, on which heroin residue was detected (Gov't Exs. 205-06, 209-16; *see also* Gov't Ex. 301 ¶ 5).

After deliberations, the jury returned a unanimous verdict of guilty on Counts One through Five, Seven, and Eight and not guilty on Count Seven. (Dkt. No. 37.) As to Count One, the jury determined that the charged heroin-trafficking conspiracy involved 100 grams or more of heroin. (*Id.*) The present motions principally concern this determination of drug quantity.

**II.     Motion to Vacate**

Pauling moves pursuant to Rule 29 to vacate, in part, his conviction on Count One. Pauling contends that the evidence at trial was insufficient to support a finding by the jury beyond a reasonable doubt that the conspiracy involved 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846. Instead, Pauling asserts, the evidence supported only a conviction on the lesser-included offense of conspiracy to distribute heroin of any quantity in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846. Pauling asks the Court to vacate his conviction on Count One and enter a judgment of conviction on this latter offense. The jury was instructed at trial on the lesser-included offense (*see* Tr. 563:18-564:7, 569:23-570:11, 572:22-574:19), and accordingly Rules 29 and 31(c) permit the Court to "enter a judgment of conviction on a lesser-included offense when it finds that an element exclusive to the greater offense is not supported by evidence sufficient to sustain the jury's finding of guilt on the greater offense," *United States v. Dhinsa*, 243 F.3d 635, 674 (2d Cir. 2001) (quoting *Virgin Islands v. Josiah*, 641 F.2d 1103, 1108 (3d Cir. 1981)).

### A. Legal Standard

Federal Rule of Criminal Procedure 29(a) directs the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A successful Rule 29 motion requires a showing by the defendant, "considering all of the evidence, direct and circumstantial, that 'no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Eppolito*, 534 F.3d 25, 45 (2d Cir. 2008) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)). In other words, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)). The Court's "deference to the jury's findings is especially important" in conspiracy cases, "because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *Id.* (quoting *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010)). In short, the defendant bringing a Rule 29 motion "bears a heavy burden." *Id.* (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010)).

In reviewing the verdict with such a high level of deference to the jury's determinations, the Court is also mindful of its responsibility to protect the defendant's Fifth Amendment rights. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 513 (2d Cir. 2015). If courts "are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine . . . whether a jury could *reasonably* find guilty beyond a reasonable doubt." *Id.* at 515 (alteration in original) (quoting *United States v. Clark*, 740 F.3d 808, 811 (2d Cir.

2014)). In particular, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.* (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

### B. Multiple Conspiracies

The evidence at trial indicated that Pauling purchased heroin from a variety of suppliers. The parties dispute whether these relationships constituted one large conspiracy or multiple pairwise conspiracies between Pauling and each supplier. When joined in a single conspiracy, this scenario is commonly known as a "wheel" or "hub-and-spoke" conspiracy, in which "one person typically acts as a central point while others act as 'spokes' by virtue of their agreement with the central actor." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014) (citing *Kotteakos v. United States*, 328 U.S. 750, 754-55 (1946)).

Even if there are "two or more phases or spheres of operation," a single conspiracy can be established "so long as there is sufficient proof of mutual dependence and assistance." *United States v. Payne*, 591 F.3d 46, 61 (2d Cir. 2010) (quoting *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004)). In the context of wheel conspiracies, "[t]o prove a single conspiracy, . . . the Government must show that there was a 'rim' around the spokes, such that the 'spokes' became coconspirators with each other." *Ulbricht*, 31 F. Supp. 3d at 554; *accord United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008). "In such conspiracies, whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of

5

one or more of the other spoke participants . . . ." *United States v. Manarite*, 448 F.2d 583, 589 (2d Cir. 1971); *accord United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995).

On the basis that the Government had offered little, if any, evidence of a conspiratorial rim connecting Pauling's various suppliers, Pauling sought a jury instruction on the issue of multiple conspiracies. (*See, e.g.*, Def. Suppl. Req. to Charge No. 4; Tr. 448:20-450:7.) The Government objected (*see, e.g.*, Tr. 447:7-448:19), citing case law from the Second Circuit stating that the "single/multiple conspiracy analysis does not apply to the trial of a single defendant," *United States v. Corey*, 566 F.3d 429, 431 n.3 (2d Cir. 1977) (citing *United States v. Sir Kue Chin*, 534 F.2d 1032, 1035 (2d Cir. 1976)). However, the only disputed factual question in the cited cases was whether the defendant was guilty of participating in a conspiracy. These cases reason that, where a single defendant is tried, "there is no danger of any 'spill over effect,'" from one conspiracy to another, "since the defendant is alleged to have participated in all conspiratorial conduct." *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2015 WL 413426, at *1 (S.D.N.Y. Feb. 2, 2015) (quoting *Corey*, 566 F.2d at 431 n.3). In the words of the attorney for the Government, "When you have one defendant in a conspiracy charge, he's either guilty or he's not guilty." (Tr. 447:8-9.)

For narcotics conspiracies charged under 21 U.S.C. §§ 841 & 846, however, the question is not merely whether the defendant is guilty or not guilty but also the quantity of drugs involved. Because Congress has enacted a tiered scheme of mandatory minimum sentences based on quantity, it is imperative that the boundaries between conspiracies be well defined. A defendant who participated in two distinct conspiracies involving, say, 400 and 600 grams of heroin respectively, would indeed be prejudiced by aggregating those quantities into a single conspiracy, thereby triggering a ten-year mandatory minimum sentence under § 841(b)(1)(A).

"[S]uch pooling is permissible only if the government adduces proof from which a reasonable juror could infer conspiratorial connections joining the spokes in a single conspiracy with [the defendant]." *United States v. Figueroa*, No. 08 Cr. 749 (ARR), 2010 WL 11463852, at *11 (E.D.N.Y. Mar. 2, 2010) (citing *Kotteakos*, 328 U.S. at 755)); *cf. Swafford*, 512 F.3d at 843 n.5 (addressing the same concern in the context of sentencing).

Cautious of this risk of prejudice, the Court granted Pauling's request for an instruction explaining the difference between single and multiple conspiracies. (Tr. 470:2-472:13, 566:17-567:13.) The instruction did not, as the Government contends, "require[] the jury to find a conspiracy of over 100 grams between the defendant and one of his suppliers." (Gov't Opp'n 7, Dkt. No. 51.) The Government could have argued that the jury should aggregate quantities derived from multiple suppliers, so long as it could prove up the conspiratorial rim between these spokes on the wheel. The Government did not—in its summation or in its briefing on this motion—identify any evidence of such a rim. (*See generally* Tr. 490:24-500:24; Gov't Opp'n 7-16.) Instead, the parties have focused on the narrower question of whether at least 100 grams of heroin were involved in the conspiracy between Pauling and a single supplier, a man identified as Kevin Lowe (or Low).

### C. The Pauling-Lowe Conspiracy

There was ample evidence at trial to support a finding beyond a reasonable doubt that Pauling conspired with his supplier, Lowe, to traffic in heroin; the defense does not dispute this for purposes of this motion. (*See* Def. Mem. 4-6, 13.) Pauling does contend, however, that the evidence was insufficient for any rational trier of fact to find beyond a reasonable doubt that the conspiracy with Lowe involved 100 grams or more of heroin. The parties agree that, viewed in

7

the light most favorable to the prosecution, the wiretap evidence established a quantity of at least **89 grams** of heroin, as follows:

1. On June 26, 2016, Pauling purchased **30 grams** of heroin from Lowe for resale to a customer known as Flow. (*See* Gov't Exs. 726, 737, 744, 757.)

2. On June 27, 2016, Pauling combined 10 grams of heroin purchased from Lowe with 20 grams of a cutting agent, yielding **30 grams** of a mixture containing heroin. (*See* Gov't Ex. 752.)

3. On July 3, 2016, Pauling sought to purchase **14 grams** of heroin from Lowe for resale to a customer known as Steve. (*See* Gov't Exs. 768-69.)

4. On July 11, 2016, Pauling sold Steve **15 grams** of heroin, which he sourced from Lowe. (*See* Gov't Exs. 783, 786-88.)

As to the July 3 transaction in particular, the wiretap recorded the following conversation between Pauling and Steve at 1:16 p.m.:

PAULING: Yo, when you coming down?

STEVE: Alright, um, I'm not sure if today or tomorrow, but I'll let you know early so it ain't too late because I know you got shit to do.

PAULING: Alright, just tell me where.

STEVE: Most likely tomorrow.

PAULING: Tell me, the count that's, you know, tomorrow.

STEVE: I'll meet you on—hold on one second—I'm on 17, as a matter of fact, same thing as last time, same thing last time.

PAULING: Where was it? I forgot, shit, because there was so many people.

STEVE: Hold on, right, right. I'mma go to, uh, 14th floor.

PAULING: 14th floor?

STEVE: Yeah.

PAULING: Aight.

(Gov't Ex. 768 (unintelligible sounds omitted).) In a call later that afternoon, Pauling told Lowe that "my man wants four—fourteen—right, and he be down tomorrow." (Gov't Ex. 769.) At the

8

end of the call, Pauling and Lowe agreed to meet the following morning to complete the sale. (*See id.*) As noted above, from these two calls, the jury could reasonably infer that Pauling sought to purchase 14 grams of heroin from Lowe to fulfill Steve's order.

In order to get from these 89 grams to the 100 grams required for a conviction under 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846, the Government contends that the jury could have made three additional inferences. Even viewing the evidence in the light most favorable to the Government, as required at this stage, none of these inferences was supported by sufficient evidence to permit a rational factfinder to establish the 100-gram element of the conviction beyond a reasonable doubt. Although the Court must assess a Rule 29 motion "with all reasonable inferences resolved in the Government's favor," *Valle*, 807 F.3d at 515, "specious inferences are not indulged," *id.* (quoting *Lorenzo*, 534 F.3d at 159).

First, the Government submits that the jury could reasonably have inferred from Steve's July 3 comment—"same thing as last time"—that Steve had purchased another 14 grams of heroin in his most recent transaction with Pauling. (*See* Gov't Opp'n 11-12, 12 n.2.) The evidence cannot support an inference beyond a reasonable doubt that Steve's comment on July 3 referred to quantity, rather than to drug type, especially given that Pauling was known to sell cocaine as well as heroin, sometimes at the same time. (*See, e.g.*, Gov't Exs. 737, 744, 757; Tr. 172:18-173:1, 370:8-16.) The only evidence of a sale to Steve just prior to July 3 was a June 29 call in which Steve sought to purchase only a single gram from Pauling:

> STEVE: Aight, aight, I'll meet you by your house, man.
> PAULING: Alright, what's the count?
> STEVE: Huh?
> PAULING: What's the count?
> STEVE: I want a 'G.' I want a 'G.' I need a 'G.'

9

> PAULING: One?
>
> STEVE: Yeah.
>
> PAULING: Alright.

(Gov't Ex. 766.) The following day, Steve called Pauling to complain about the quality of the heroin, suggesting that the one-gram transaction was accomplished. (*See* Gov't Ex. 767.) No evidence from the wiretap or any other source indicates that there was a separate 14-gram transaction conducted or even contemplated in the four days between these calls and the July 3 order. As discussed further below, the Government omitted this one-gram transaction from its chart summarizing Pauling's transactions. This omission implies that the Government, too, has trouble reconciling its desired inference with the only evidence in the record of a previous sale.

Second, the Government argues that the jury could reasonably have inferred that Lowe supplied the previous 14 grams because "the evidence at trial showed the defendant worked more closely with Low[e] than with any other supplier, and went to Low[e] to fill his large orders." (Gov't Opp'n 12 n.1.) Even assuming the existence of a previous 14-gram transaction, the Government offers nothing but speculation to suggest that Lowe supplied the heroin for that deal. From the wiretap, the Government gleaned evidence of at least one other repeat supplier, known as Conrad, with whom Pauling dealt during the same period as Lowe. (*See* Gov't Ex. 718, 724, 727-28, 735, 770.). To attribute this 14-gram transaction to the Pauling-Lowe conspiracy would require precisely the kind of guesswork the Second Circuit has deemed insufficient to support a conviction. *See, e.g.*, *United States v. Pinckney*, 85 F.3d 4, 7 (2d Cir. 1996) (finding it unreasonable to infer that, where a defendant "previously dealt with a number of scrap dealers," a transaction was conducted with any particular one of them).

Finally, the Government asserts that even if the evidence failed to establish specific transactions amounting to 100 grams, "it was reasonably foreseeable to the defendant that his

10

conspiracy with Low[e] would involve more than 100 grams of heroin." (Gov't Opp'n 13.). The Government is correct that "individual defendants are responsible for all reasonably foreseeable quantities of drugs distributed by a conspiracy of which they were members." *United States v. Johnson*, 633 F.3d 116, 118 (2d Cir. 2011) (per curiam). But the Government has not provided evidence of either additional transactions or agreements or of the quantity of drugs to be imputed under this rule. To support a reasonable-foreseeability approach to drug quantities, the Government is expected to "present[] evidence of specific drug quantities and a link from those quantities to a basis for inferring that the quantities would have been reasonably foreseeable to the defendant—a basis that is wholly lacking here." *United States v. Thompson*, 633 F. App'x 534, 540 (2d Cir. 2015) (summary order).[2] In other words, a defendant can be held culpable only for the reasonably foreseeable drug quantities actually involved in the conspiracy, not unknown quantities that the Government speculates might have been involved in unspecified transactions or agreements. "[T]he courts of appeals have refused to allow . . . extrapolation so far as to fabricate transactions of which there is no evidence." *Hickman*, 626 F.3d at 769.

In sum, the Government offered insufficient evidence at trial to sustain the jury's finding with respect to drug quantity. Instead, the Government relies upon a series of inferences rooted in speculation rather than evidence. When "viewed in its totality, the evidence of [quantity] is

---

[2] Other Courts of Appeals have similarly rejected attempts by the Government to inflate drug quantities by arguing that the "conspiracy encompassed far more drug distribution activity (and that [a defendant] could reasonably foresee such quantity) than that of which the Government could produce competent evidence." *United States v. Hickman*, 626 F.3d 756, 768 (4th Cir. 2010); *accord United States v. Navarrette-Aguilar*, 813 F.3d 785, 796 (9th Cir. 2015) (finding it unreasonable to infer a larger drug quantity based on evidence of, as in this case, a series of "ad hoc" transactions in a "temporary and unstable" supplier-dealer relationship); *United States v. Daniels*, 723 F.3d 562, 571 (5th Cir.) (finding insufficient the Government's assertion that the quantities established by the evidence were "just 'the tip of the iceberg'"), *modified on other grounds on reh'g*, 729 F.3d 492 (5th Cir. 2013); *cf. United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir. 1997) (requiring, in the sentencing context, "specific evidence" of drug quantities).

11

insufficient to dispel reasonable doubt on the part of a reasonable fact finder." *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005). Even "[v]iewed in the light most favorable to the prosecution, the evidence, at best, gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' and thus 'a reasonable jury must necessarily entertain a reasonable doubt.'" *Id.* (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)). Accordingly, Pauling's Rule 29 motion is granted.

### III. Motion for a New Trial

Pauling moves in the alternative for a new trial pursuant to Federal Rule of Criminal Procedure 33. That Rule permits the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Where, as here, a court grants a Rule 29 motion made concurrently with a Rule 33 motion, "the court must also conditionally determine whether any motion for a new trial should be granted if the [Rule 29 ruling] is later vacated or reversed." Fed. R. Crim. P. 29(d)(1). Pauling raises two interrelated bases for this motion: first, that the verdict was against the weight of the evidence, and second, that the Government improperly withheld two misleading summary charts that were then used in its summation.

#### A. Legal Standard

In deciding Rule 33 motions for a new trial, courts must determine "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). Such motions "are granted only in 'extraordinary circumstances,'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *United States v. Torres*, 128 F.3d 38, 48 (2d Cir. 1997)), where a court is left with "a real concern that an innocent person may have been convicted," *Aguiar*, 737 F.3d at 264 (quoting *Ferguson*, 246 F.3d at 134).

12

When a defendant challenges a jury's verdict as against the weight of the evidence, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134. "The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* In doing so, the Court "must strike a balance between weighing the evidence and credibility of the witnesses and not 'wholly usurp[ing]' the role of the jury." *Id.* at 133 (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)).

Pauling's challenge to the Government's use of summary charts is most akin to motions concerning improper statements by prosecutors during summations. "An improper summation will only warrant a new trial when the challenged statements are shown to have caused substantial prejudice to the defendant; rarely will an improper summation meet the requisite level of prejudice." *United States v. Daugerdas*, 837 F3d 212, 227 (2d Cir. 2016) (quoting *United States v. Mapp*, 170 F.3d 328, 337 (2d Cir. 1999)), *petition for cert. filed*, No. 16-1149 (U.S. Mar. 20, 2017). The test for substantial prejudice looks to "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 95 (2d Cir. 2014) (quoting *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002)). Finally, where a defendant did not object to the challenged remarks at trial, courts have required a showing of "flagrant abuse." *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) (quoting *United States v. Araujo*, 79 F.3d 7, 9 (2d Cir. 1996)).

**B.     Timeliness**

The Government asks the Court to deny Pauling's motion as untimely without reaching the merits. Except when defendants rely on newly discovered evidence, the Rules require

13

motions for a new trial to "be filed within 14 days after the verdict." Fed. R. Crim. P. 33(b)(2). Pauling first made his Rule 29 motion at the close of the Government's case without reference to Rule 33. (Tr. 383:15-19.) The Court reserved decision on that motion pursuant to Rule 29(b) and submitted the case to the jury. (*Id.* at 398:16-19.)

After the jury returned its verdict, defense counsel stated its intention to "make a renewed Rule 29 motion with respect to Count One" and orally asked the Court to "extend the time from 14 days provided by the rule to 30 days." (*Id.* at 611:12-14.) That request was granted, resulting in a March 20, 2017 deadline. (*See id.* at 611:18-19.) By letter dated March 14, the defense sought "a one week extension, to Friday, March 24, 2017, of the deadline for filing any post-trial motion on behalf of Mr. Pauling in the above-referenced matter." (Dkt. No. 46.) The letter indicated that the Government did not object, and the request was granted the following day. (*Id.*) At the time of its March 15 order, the Court believed it was granting an unopposed motion to extend the time for filing "any post-trial motion," including one made under Rule 33. (*See id.*) Defense counsel acknowledges that in retrospect it could have "more carefully worded" its initial oral request. (Def. Reply 5, Dkt. No. 52.)

Even if the Court's previous order did not have the intended effect, the Court would have granted—and now does grant—an extension of time pursuant to Rule 45(b)(1)(B), which permits after-the-fact extensions "if the party failed to act because of excusable neglect." In considering whether to grant such an extension, courts look to "the danger of prejudice to the [non-movant], the length of the delay and its potential impact upon judicial proceedings, the reason for the delay, including whether it was in the reasonable control of the movant, and whether the movant acted in good faith." *United States v. Hooper*, 9 F.3d 257, 259 (2d Cir. 1993) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). The Government

14

identifies no prejudice to its ability to oppose this motion, no potential impact on judicial proceedings, and no suggestion of bad faith on the part of the defendant. Most importantly, as further discussed below, the delay was caused primarily by the Government's own conduct and defense counsel's need to examine two surprise summary charts retrospectively in light of the evidence at trial. The Court hesitates to characterize the defense's delay as neglectful, but it was certainly excusable, and the Rule 33 motion will be considered on the merits.

### C. Weight of the Evidence

For substantially the same reasons stated above with respect to Pauling's Rule 29 motion, the Court finds the jury's drug-quantity determination against the weight of the evidence adduced at trial. Unlike Rule 29, however, under which the Court viewed the evidence in the light most favorable to the prosecution, Rule 33 permits the Court to weigh the evidence objectively. Having done so, the Court harbors significant doubt that the Government proved the 100 grams of heroin necessary for a conviction under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846.

First, the Court agrees with the parties that the evidence established a conspiracy between Pauling and Lowe to distribute and possess with intent to distribute heroin. Likewise, the Court agrees that the Government provided evidence to establish that the conspiracy involved the following quantities of heroin: **30 grams** sold to Flow on June 26, 2016; a **30-gram** mixture discussed on June 27; and **15 grams** sold to Steve on July 11. *See supra* Part II.C. But the Government, which bore the burden of proof, did not adduce convincing evidence to suggest that this last transaction was distinct from Steve's July 3 request for 14 grams. (*See* Gov't Exs. 768-69.) In particular, there was no evidence of any delivery between Steve's 14-gram order on July 3 and the well-documented 15-gram delivery on July 11. (*See* Gov't Exs. 768, 783-87.) Viewing the evidence objectively, rather than in the light most favorable to the Government, the

15

Court finds that the Government proved only **75 grams** attributable to the Pauling-Lowe conspiracy—not the 89 grams attributed under the stricter standard of Rule 29.

Second, the Court declines to make any of the three speculative inferences discussed at length above in order to increase the quantity further. With the evidence at best in equipoise and the burden of proof on the Government, the weight of the evidence does not support the inference of a previous 14-gram transaction, much less one that could be sourced to Lowe. The Government did not provide competent, satisfactory, and sufficient evidence to support attributing 100 grams or more to the Pauling-Lowe conspiracy.

Given that the weight of the evidence cuts against the jury's verdict with respect to Count One, the Court conditionally grants Pauling's Rule 33 motion. In the event that the Court of Appeals vacates or reverses the Court's Rule 29 ruling, Pauling would be entitled to a new trial on Count One.

### D. Summary Charts

The Court's decision is buttressed by the conduct of the attorneys for the Government with respect to the summary charts used during summation. In advance of trial, Pauling moved for, among other things, an order directing the Government to turn over "all transcripts, charts, exhibits and the like the Government intends to use during trial." (Dkt. No. 28.) In its opposition to that motion, the Government represented that the parties had reached an agreement, pursuant to which the Government would "provide to defense counsel all available charts and exhibits, with materials in each category to be supplemented on a rolling basis as they become available before trial." (Dkt. No. 32.) The Government urged that the Court therefore find the motion "moot." (*Id.*) The parties confirmed this agreement at the final pretrial conference on

February 6, 2017. (*See* Dkt. No. 35.) On the basis of the parties' representations, the Court deemed Pauling's motion moot. (*Id.*)

On February 9, the Government indicated to defense counsel that it was preparing three summary charts. (Kaminsky Decl. ¶ 3, Dkt. No. 48.) On February 11, however, the Government informed defense counsel that it had decided not to use summary charts. (*Id.* ¶ 4.) No such charts were provided to the defense until two charts were displayed to the jury during the Government's summation. (*See id.* ¶ 5 & Ex. A, at 29 ("Chart A"), 33 ("Chart B"); Tr. 491:10-500:24.) The first chart tabulated a subset of transactions between Pauling and his customers, totaling 103 grams of heroin, which the Government argued were attributable to his conspiracy with Lowe. (*See* Chart A; Tr. 491:16-17.) The second chart also included other transactions involving additional customers and suppliers. (*See* Chart B; Tr. 500:13-22.) For the first time in the trial, the Government, through the charts, attributed 28 grams to Steve's July 3 call: 14 grams from that order and 14 grams from the "last time." (*See* Charts A-B; Tr. 495:10-25.) Neither chart included Steve's June 29 order of one gram. (*See id.*) Nevertheless, the Government implied that the charts covered all of the transactions during the covered time period. (*See* Tr. 500:15-16 ("But look how high the number goes just in this period of time."); *id.* 500:20-21 ("And when you add it all up . . . .").)

Pauling contends that the Government's surprise use of these charts prejudiced his defense. Without time to review the charts in advance of summations, defense counsel were unable to identify—much less formulate an argument against—what Pauling describes as the charts' misleading content. The Court agrees that the charts were misleading: without listing Steve's June 29 order, and by suggesting that the charts were comprehensive, the Government effectively frustrated scrutiny of the doubling of Steve's July 3 order.

17

The Government provides no satisfactory response to these concerns. In terms of the charts' content, the Government's opposition memorandum does not even acknowledge the omission of the June 29 order. (*See* Gov't Opp'n 17.) As to its failure to provide the charts in accordance with the parties' agreement and its representations to the Court, the Government's answers are largely nonresponsive. (*See id.* at 17-20.) In particular, the Government asserts that there was a condition to the parties' agreement: that the Government would turn over only materials that the defense already had a right to receive, such as exhibits the Government intended to offer into evidence. (*See id.* at 18 n.3.) However, no such condition was mentioned in Pauling's motion *in limine*, the Government's response, or the pretrial conference. (*See generally* Dkt. Nos. 28, 32, 35.) The Government then argues that "[d]efense counsel never made a motion to receive, and the Government never consented to provide . . . an outline of the Government's closing argument." (Gov't Opp'n 18 n.3.) No one suggests otherwise; at issue here is the summary charts, which the defense did move to receive, and which the Government did consent to provide, not just in a private agreement but in its successful attempt to convince the Court to decline to rule on the defense motion.

The Government reports that it ultimately decided to use summary charts early in the morning on the day of summations, and the Court has no reason to doubt this representation. (*Id.*) The Government does not explain, however, why the charts were not disclosed at that time, given its commitment to supplement the materials on a rolling basis. The Government contends that Pauling's complaints about the charts should be dismissed for failure to have objected during summations or to have requested additional time to review them. (*Id.* at 20 n.4.) Given that defense counsel was presented with the charts in the middle of summations—rather than earlier

18

that morning when the Government decided to use them—the defense can hardly be faulted for failing to catch the charts' discrepancies on the spot.

Analyzing the factors applicable to an improper summation, the Court concludes that the use of the charts by the Government substantially prejudiced Pauling's defense. The conduct was significant. Even if it is true that the Government believed in good faith that its agreement with defense counsel extended only to charts to be admitted into evidence, the Court is not persuaded that such an interpretation was warranted, in light of the parties' actual language. The Government made a commitment that it did not keep.[3] Moreover, the Court is convinced that the use of the charts made a difference in the jury's verdict. Until the Government used the misleading charts in summation, it was not at all clear how it could establish the 100-gram quantity in a single conspiracy. Unsurprisingly, the jury explicitly asked to see the charts during deliberations. Given the timing of the charts' disclosure, the Court was unable to take remedial measures at trial. Finally, for the reasons discussed at length with respect to the sufficiency and weight of the evidence, the jury's finding on drug quantity would be highly uncertain absent the challenged conduct, had the defense been permitted to review in advance and rebut the summary charts' misleading content. Given this prejudice, a new trial is warranted on Count One.

## IV. Conclusion

For the foregoing reasons, Pauling's conviction on Count One is vacated, and a judgment of conviction will be entered for the lesser-included offense of a narcotics conspiracy in violation

---

[3] Having previously agreed to disclose all charts it intended to use at trial, the Government's failure to disclose the summary charts can also be understood as a failure to comply with its discovery obligations in violation of Federal Rule of Criminal Procedure 16. In the case of such violations, Rule 16(d)(2)(D) permits the court to enter "any other order that is just under the circumstances," including granting a new trial where a defendant is substantially prejudiced. *United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003).

of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846. Pauling's motion for a new trial is conditionally granted. The Clerk of Court is directed to close the motion at docket number 47.

Pauling's sentencing is currently scheduled for June 16, 2017. To the extent that an adjournment will be necessary for the parties and the Probation Office to revise their submissions, the parties shall jointly propose a new schedule by June 15, 2017.

SO ORDERED.

Dated: June 12, 2017
New York, New York

_____
J. PAUL OETKEN
United States District Judge